UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 3:09-cr-00065 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| NARON CELESTINE and | ) | [Re:  Motion at Docket 45; |
| STEVEN LAMONT RILEY, | ) |         Joinder at Docket 53] |
| | ) | |
| Defendants. | ) | |

## I.  MOTIONS PRESENTED

At docket 45, defendant Naron Celestine ("Celestine") moves to transfer this case from the District of Alaska to another judicial district.  Celestine's co-defendant, Steven Lamont Riley ("Riley"), joins in the motion at docket 53.  The United States opposes the motion.  Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

Celestine, Riley, and Tillman Bradley III ("Bradley")[1] are charged in a two-count indictment.  In Count 1 all three are charged with a conspiracy to distribute 500 grams or more of a mixture and substance containing cocaine.  In Count 2 Celestine and Bradley are charged with distributing 500 grams or more of a mixture and substance containing cocaine.

To support their position that the trial must be moved to another judicial district, defendants point to articles which have appeared in both the print and on-line versions

---

[1]Bradley is presently a fugitive.

of an Anchorage newspaper, the *Anchorage Daily News* ("AND") and one article from the *Fairbanks Daily News-Miner*. Copies of the articles were attached to Celestine's motion and appear at docket 45-3.

The *News-Miner* is published in Fairbanks and is not widely circulated outside Fairbanks. AND, however, circulates in many communities within the District of Alaska. Although it has the largest circulation in Alaska, in many communities AND competes for readers' attention with other newspapers, including the *Frontiersman* (Wasilla and Palmer), the *Peninsula Clarion* (Kenai and Soldotna), the *Homer News*, the *Seward Phoenix Log*, the *Cordova Times*, the *Valdez Star*, the *Kodiak Daily Mirror*, the *Bristol Bay Times* (Dillingham), the *Tundra Drums* (Bethel), and the *Dutch Harbor Fisherman*. The venire for trials conducted in Anchorage includes residents of Wasilla, Palmer, Kenai, Soldotna, Homer, Seward, Cordova, Valdez, Kodiak, Dillingham, Bethel, and Dutch Harbor, among other towns and villages. Defendants point to no publicity in the local papers serving any of those communities.

The first AND article was published on June 15, 2009. Headlined, "Missing Necklace at Center of Shooting Has Hip-Hop Ties," it reported on a shooting death in an Anchorage parking lot saying that a "mysterious missing necklace, rumored to be worth $100,000" may have supplied a motive for the slaying of Joe A. Young, Jr. The article goes on to say that as he lay dying, Young told the police that "Cole" shot him. The article then advises that police say "Cole" is Celestine and that he may have put a $10,000 price on Young's head for stealing the necklace. The article is accompanied by a photo said to be taken from Sean P's MySpace page. Sean P is described as a nationally known rapper. The photo shows "Cole" wearing the necklace while he and two other black men stand near Sean P.

The same photo accompanies a June 16, 2009, AND article headlined "Missing Bling At Center of Shooting With Ties to Rapper Sean Paul." In the second article, it is said that the necklace allegedly belonged to Sean Paul. The story then repeats the assertion that "Cole" or "Cold" put out a $10,000 hit on the victim after the necklace was snatched from around Cole's neck at a local nightclub. The article then states: "Cole, real name Naron Celestine, 38, has a long history of drug-related arrests and

-2-

convictions. But Rex Butler, an attorney for one of the men Cole allegedly hired to kill Young, disputes the feds' allegations of a hit." The article then quotes Butler, who is a well-known Anchorage criminal defense attorney, as saying that during his investigation of the matter people have told him that Cole "couldn't put two nickels together, much less $10,000."

The last article from AND, to which defendants point titled "Figure In Parking Lot Slaying Faces Cocaine Indictment," was published August 25, 2009. The lead paragraph reads, "Naron Celestine, whose ties to a Kansas City rapper and a gaudy $100,000 necklace surfaced during investigation of a high-profile killing at the Sport Authority in June has been hit with federal charges of conspiring to distribute and distributing more than 500 grams of cocaine, according to documents unsealed Tuesday. " In a brief summary of the conspiracy charge, the article notes that Tillman and Riley were also charged but "remain on the run." The article then reports that Celestine was arrested and pleaded not guilty. Explaining why the indictment had to be unsealed, the article points out that an assistant United States attorney had asked that the matter be sealed pending completion of a collateral investigation.

Acknowledging that the collateral investigation was not specifically identified, the AND article goes on to imply it involved the June shooting of Joe Young, Jr. Repeating what was in the earlier AND articles, the August 25 story goes on to add comments by a state assistant district attorney who describes the assertion that Celestine hired hit men as "hearsay." The attorney says that if he had evidence he would charge Celestine, but "I don't have anything like that." After pointing out that three men (not including Celestine) have been charged with killing Young, the article says the police and prosecutors believe the three may have been seeking a reward Celestine allegedly offered or else they were trying to steal it for themselves. Thus, in this story Celestine's "contract" on Young has morphed into a reward for the necklace. The article then quotes Butler, who says that he assumes Celestine might shed light on the killing "either as a witness for himself or as a witness for the government" adding, "[i]t's not unusual for a person who is facing a drug conspiracy charge . . . to want to help themselves." The article states, "Butler says there was no contract." The article adds a description of

Butler's theory that the three men arrested for killing Young were acting in self defense when Young pulled a gun on them. At the end of the story it is noted that Celestine is being held in custody pending trial on the drug charges, before pointing out

> [Celestine] was convicted of conspiracy to distribute cocaine in 1992 and was sentenced to 35 months in prison. In 1995 he was charged with maintaining a place for drug trafficking, possessing cocaine and possessing a gun as a felon. He was convicted only on the weapons charge and was sentenced to 75 months in prison.

The article from the Fairbanks' paper was published August 26, 2009. Titled "Figure in Alaska Slaying Indicted on Drug Charges," the story is short. It reports that Celestine was charged with distributing more than 500 grams of cocaine, and that his name surfaced in relation to the shooting of Joe Young, Jr. The article adds: "Court documents say the word on the street was that Celestine put a $10,000 hit on Young in retaliation for the theft [of the necklace] but Assistant District Attorney John Skidmore says that's difficult to prove."

Defendants have not submitted any evidence that there has been any publicity relating to either of them, to Young's slaying or to the charges in the case at bar in any of the newspapers published in the other communities from which the venire for Anchorage trials is drawn. Defendants have not submitted any media accounts from any source which have come out subsequent to August 26, 2009.

### III. DISCUSSION

Celestine's motion and Riley's joinder are premised on the notion that prejudice among prospective jurors in this district must be presumed, because of extensive pre-trial publicity. The concept of presumed prejudice has been discussed by the Supreme Court and the Ninth Circuit.

In *Irvin v. Dowd*,[2] the Supreme Court concluded that a man convicted of murder had been denied a fair trial based on the extent and nature of pre-trial publicity in Gibson County, Indiana, where he was tried. The county was a rural county with a

---

[2] 366 U.S. 717 (1961).

-4-

population of only about 30,000 people,[3] where 95 percent of the households were alleged to receive delivery of the newspapers which carried the printed pre-trial publicity.[4] The Court described the publicity as follows:

> [T]he awaited trial of petitioner had become the cause *celebre* of this small community–so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures were unleashed against him during the six or seven months preceding his trial. * * * These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson . . . , for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99 year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). * * * [One] story characterized petitioner as remorseless and without conscience . . . . In many of the stories petitioner was described as the "confessed slayer of six" a parole violator and fraudulent-check artist. * * * On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) "as well as the robbery-murder of Mrs. Mary Holland, the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky."[5]

It is evident that the publicity was both extensive and concentrated on a small population. The publicity was unfairly prejudicial, for it was rife with information that would be inadmissible at trial. The publicity was highly inflammatory, because it was of

---

[3]*Id.* at 719.

[4]*Id.* at 725

[5]*Id.* at 725-26.

the sort which would naturally evoke strong and lasting negative feelings about Irwin–he committed many other serious crimes, he went AWOL during the war, he was guilty of multiple murders, and he dragged his feet before confessing in an attempt to get a lesser punishment.

In *Daniels v. Woodford*,[6] the crime involved was the murder of two local police officers committed while they were attempting to arrest Daniels pursuant to a warrant relating to a bank robbery. The Ninth Circuit described the pre-trial publicity in the *Daniels* case as follows:

> The murders of Doty and Trust generated extensive and nearly continuous publicity immediately after the shootings and again before Daniel's trial. Articles described SWAT team searches of the neighborhood where Daniels was hiding.
>
> News accounts described the perpetrator as a Black paraplegic, and Daniels was identified as the killer from the very beginning.
>
> * * * Three months before the trial, news articles covered the local school board's proposal to rename its football stadium in honor of officer Doty. One month before Daniel's trial was to begin, on the anniversary of the killings, a statue commemorating fallen police officers was unveiled by the county. The publicity surrounding the memorial and its unveiling ceremony largely referred to officers Trust and Doty. The memorial statute, standing nine feet tall, was located across the street from the Riverside County courthouse where Daniels was tried.
>
> Based on our review of the California Supreme Court's findings, the public's response to this publicity clearly amounted to a "huge" wave of public passion. As the California Supreme Court described it, police stations were "deluged" with calls from citizens offering tips on the investigation and offering to establish a memorial fund. In addition, local newspapers printed numerous letters from readers calling for Daniels's execution. The officers were turned into "posthumous celebrities," and approximately three thousand people attended their funerals. That the news coverage saturated the county is reflected in the fact that eighty-seven percent of the jury pool recognized the case from the media coverage. * * *

---

[6]428 F.3d 1181 (9th Cir. 2005).

Case 3:09-cr-00065-HRH   Document 82   Filed 11/02/09   Page 6 of 10

The press accounts did not merely relate factual details, but included editorials and letters to the editor calling for Daniels's execution. In addition, news articles reflected the prosecution's theory of the case by attributing the killings to Daniels's desire to escape justice. Also well-publicized by the press was Daniels's past criminal offenses, including an arrest for shooting at a police officer. Such information was highly prejudicial and would not have been admissible at the guilt phase of Daniels's trial.[7]

Explaining its conclusion that a change of venue was required based on presumed prejudice, the *Daniels* court wrote:

Three factors should be considered in determining presumed prejudice: (1) whether there was a 'barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion'; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.[8]

Significantly, the *Daniels'* court cautioned that prejudice is not lightly to be presumed: "Prejudice is presumed only in extreme instances 'when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime.'"[9] *Daniels* was an extreme case for, as in *Irwin*, the pre-trial publicity was of a sort which was both unfairly prejudicial and, for a variety of reasons, likely to invoke strong and lasting impressions of the defendant–he was a cop killer, he was hunted by a SWAT team, one of the men he killed was such an outstanding police officer that his name warranted special public recognition.

*Harris v. Pulley*[10] involved a *habeas* petitioner who had been convicted in state court on two counts of murder and sentenced to death. Affirming the district court, the

---

[7]*Id.* at 1211-12 (citations omitted).

[8]*Id.* at 1211 (quoting from *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir. 1998) *amended* 152 F.3d 1223).

[9]*Daniels*, 428 F.3d at 1211.

[10]885 F.2d 1354 (9th Cir. 1998).

-7-

Ninth Circuit rejected a claim that prejudice should be presumed on the basis of pre-trial publicity. The Ninth Circuit described the pre-trial publicity as follows:

> Pervasive media coverage of Harris and his crimes started with his televised capture for bank robbery. The pretrial publicity apparently included stories that Harris and his brother had confessed to the crimes, that Harris had previously been convicted of manslaughter and that Harris had violated his parole. Numerous editorials and letters to the editor called for the death penalty and a television poll overwhelmingly showed that viewers supported the death penalty in this case. Even the battle between the U.S. Attorney's and District Attorney's offices concerning who would have the first opportunity to prosecute Harris received extensive coverage by the local media for over two weeks.[11]

The Court of Appeals noted that the accounts of Harris' prior criminal record and alleged confession were published within two weeks of the date of the murders on July 5, 1978, and that the accounts of the inter-office rivalry ran for two and a half weeks ending on August 20, 1978. It concluded that the publicity had dissipated considerably by the time jury selection began a few months after the murders. The *Harris* court reviewed all the pre-trial publicity and concluded that it was largely of a factual nature, noting that even the inter-office rivalry between prosecutors focused mostly on the merits of the competing systems of criminal justice and did not report any pre-trial judgment of Harris' guilt by either office. *Harris* suggests that when pre-trial publicity is mainly factual, even publication of editorials and letters to the editor asserting a need to impose the ultimate punishment on a defendant whose confession was reported in the media do not require a finding of presumed prejudice, at least when the publicity had diminished in the weeks before trial.

In *Ainsworth v. Calderon*,[12] the Ninth Circuit confronted another death row resident's petition for a writ of *habeas corpus*. The case arose out of a horrific crime in which Ainsworth shot a woman through the hips and pelvis, stuffed her in a car trunk, then moved her to the back seat and raped her. Eventually her corpse was dumped in

---

[11] *Harris*, 885 F.2d at 1360 (quoting from *Harris v. Pulley*, 692 F.2d 1189, 1199 (9th Cir. 1982)).

[12] 138 F.3d 787 (9th Cir. 1998).

-8-

a wooded area. Ainsworth's co-defendant was arrested and confessed. The pre-trial publicity was, with the exception of a single article, all published months before the trial commenced. The appellate court found the reporting to be mostly factual in nature, and observed that to the extent any reporting was prejudicial because it portrayed the victim as sympathetic or disclosed Ainsworth's criminal record, it was printed several months before trial. No editorials or opinion pieces speculating about Ainsworth's guilt were disclosed. In these circumstances, the *Ainsworth* court concluded that prejudice should not be presumed. Like *Harris,* this case indicates that the passage of time between the publicity and the trial date is an important consideration.

With the preceding case law as a guide, the court concludes that Celestine's motion borders on the frivolous. It cannot be said with a straight face that the community where trial will be held was saturated with prejudicial and inflammatory publicity. The handful of stories do not amount to saturation in Anchorage itself, much less in the many other communities from which prospective jurors will come. While the stories speculated about the Young killing, the articles were largely factual. No editorials were published; no cartoons were printed. Similarly, the stories cannot fairly be described as inflammatory as that term is used in the reported decisions. The stories here report events and speculation about events which include a very serious crime, but nothing in the stories would inflame public passion. Violent crime is all too common. Stories about violent crime appear in the Anchorage media on a daily basis.

The articles did mention Celestine's prior crimes and punishments imposed, as well as the fact that Riley was "on the run." These prejudicial facts would be inadmissible at trial. However, the passage of time assures that almost nobody will remember the information. Even if a prospective juror did remember it, *voir dire* will be conducted in such a fashion that the prospective juror can be excused without alerting the other prospective jurors to the information.

## IV. CONCLUSION

For the reasons above, Celestine's motion at docket 45 and Riley's joinder in that motion at docket 53 are **DENIED**.

DATED at Anchorage, Alaska this 2nd day of November 2009.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE